802 F.2d 456
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Donald E. CAHILL, Plaintiff-Appellant,
v.
BIG BEAR STORES COMPANY; International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and Helpers of
America, Local # 284; Gil Rhodes; and
Roger Warner, Defendants-Appellees.
 No. 84-3952.
 United States Court of Appeals,
Sixth Circuit.
 Aug. 27, 1986.
 
 Before KEITH, NELSON, and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Donald Cahall brought suit under Sec. 301 of the Labor Management Relations Act (29 U.S.C. Sec. 185) and under the Federal Arbitration Act (9 U.S.C. Secs. 1011) against his former employer, Big Bear Stores, for breach of a collective bargaining agreement in firing him and against Teamsters Local Union 284 for breach of its duty of fair representation. Cahall appeals the grant of summary judgment for defendants in district court. We shall affirm the judgment.
 
 
 2
 Cahall was a truck driver with fourteen years of service with Big Bear. In January of 1981 Big Bear received an anonymous telephone tip that one of its drivers had a practice of taking excessively long breaks at the Plateau Truck Stop in Waverly, Ohio. Big Bear supervisors checked their records to identify potential suspects. It was found that one of Cahall's delivery routes was between Columbus, Ohio and Huntington, West Virginia, and on February 17, 1981, Big Bear investigators saw Cahall taking an excessive break in the course of a delivery run on that route. According to Big Bear, no action was taken at that time because the company felt that foggy weather might have accounted for the delay. Cahall was aware of this incident, and was thus made aware that he was being watched.
 
 
 3
 On the night of March 10, 1981, company supervisors again followed Cahall on his Columbus to Huntington route. The supervisors observed Cahall taking excessive break and lunch time. Cahall's time sheet recorded this time as work time for which he would be paid, rather than relief time for which he would not be paid.
 
 
 4
 On March 12, 1981, Cahall was called to a meeting with the company. His union steward and union business agent were also present. Big Bear representatives indicated that it was their intention to terminate Cahallis, employment. During a break in the proceedings, the union men suggested that Cahall offer to admit that he took some extra time, since the last person who had done this received a mere thirty day suspension. When the meeting resumed, one of the union men said that "maybe the man did take a little bit too much time." However, the company continued to insist on termination.
 
 
 5
 The Union filed a grievance over Cahall's discharge, and an arbitration hearing was held in July of 1981. Cahall was represented by a Union-hired attorney, Jerry Riseling. Appellant complains that he was not allowed to bring in his own attorney to represent him at the hearing. He also claims that his representation by Riseling was ineffective, pointing especially to the fact that only two witnesses were called to testify on his behalf and to the fact that a man named Skip Bailey was not called to testify. (An affidavit signed by Bailey states that Cahall arrived at the truck stop at 11:30 p.m.; Cahall claims he arrived at 11:15 p.m., and Bia Bear says it was 11:08.
 
 
 6
 The arbitrator upheld the discharge, and Cahall filed suit in the Court of Common Pleas of Franklin County, Ohio. The defendants removed the action to federal district court, where Judge Duncan granted summary judgment to the defendants on the federal claims and sent the case back to state court for determination of the state claims. It is from this grant of summary judgment that Cahall appeals.
 
 
 7
 "The court of appeals is mandated to apply the same test in passing upon an award of summary judgment as that utilized by the trial court to grant the motion. Accordingly the conclusions of the trial court are not protected by the 'clearly erroneous' rule, but rather the appellate tribunal, viewing the evidence in the light most favorable to the party opposing judgment, must determine if a genuine issue of material fact exists." Glenway Industries Inc. v. Wheelabrator-Frye, Inc., 686 F.2d 415, 417 (6th Cir.1982) (citations omitted).
 
 
 8
 This is a "hybrid Sec. 301" action, the purpose of which is to set aside a final and binding decision reached pursuant to the terms of a collectively bargained agreement. In such a case '[tlhe substance of the section 301 claim will be heard in federal court only if the internal dispute resolution process has broken down. Otherwise the interests of the employer and union in an efficient grievance resolution system are paramount." Badon v. General Motors Corp., 679 F.2d 93, 97 (6th Cir.1982).
 
 
 9
 The Supreme Court recently said of these suits:
 
 
 10
 "The suit against the employer rests on Sec. 301, since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. 'Yet the two claims are inextricably interdependent. "To prevail against either the company or the Union, ... [employee-plaintiffs] must not only show that their discharge was contrary to the contract but m ust also carry the burden of demonstrating breach of duty by the union." ... The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both. The suit is thus not a straightforward breach-of-contract suit under Sec. 301, as was Hoosier, but a hybrid Sec. 301/fair representation claim, amounting -to 'a direct challenge to "the private settlement of disputes under [the collective-bargaining agreement]." '
 
 
 11
 DelCostello v. International Brotherhood of Teamsters, 462 U.S. 151, 164-65 (1983) (quoting United Parcel Service v. Mitchell, 451 U.S. 56, 66 (1981) (Stewart, J., concurring in judgment) (quoting United Auto Workers v. Hoosier Cardinal Corp., 383 U.S. 696, 702 (1966) ) ) (footnote omitted).
 
 
 12
 Therefore, the crux of our inquiry is whether the duty of fair representation was breached by the Union. In Vaca v. Sipes, 386 U.S. 171 (1967), the Supreme Court announced the standard for determining when the duty of fair representation had been breached. Such breach "occurs only when a union's conduct toward a member ... is arbitrary, discriminatory, or in bad faith." Id. at 190.
 
 
 13
 In Vaca v. Sipes, the employee challenged the failure of the union to take his claim to arbitration. In Hines v. Anchor Motor Freight, Inc., 424 U.S. 554 (1976), the Supreme Court applied the principles of Vaca v. Sipes to a case in which an arbitration proceeding had taken place. Only where the union has breached its duty to the employee, the Supreme Court there held, can the arbitral decision be set aside. "[T]his involves more than demonstrating mere errors in judgment." Hines, 424 U.S. at 571. The employee must show that his "representation by the Union has been dishonest, in bad faith, or discriminatory ...." Id. Elaborating on this standard, our court has said:
 
 
 14
 "A union's conduct may be sufficiently arbitrary to establish a breach of its duty to fairly represent its members when it handles a grievance in a 'perfunctory' manner, with caprice or without rational explanation. The employees need not necessarily show bad faith, yet mere negligence or mistaken judgment is insufficient to establish a breach of the union's duty."
 
 
 15
 Poole v. Budd Co., 706 F.2d 181, 183,(6th Cir.1983) (citations omitted). We do not think that Cahall has even come close to meeting this strict standard here.
 
 
 16
 The Union did at least an adequate job in representing Cahall. Cahall's real problem is that he got caught "stealing time" from Big Bear. After Cahall was caught, Union officials accompanied him to the March 12, 1981 meeting. The officials tried to arrange a settlement, but Big Bear rejected this. The Union hired a lawyer to take Cahall's case to arbitration. This lawyer seems to have fairly presented the case to the arbitrator, judging from the brief he filed in the arbitral proceeding. The mere fact that the arbitrator found that Cahall did in fact "steal time" and that the discharge was thus justified does not speak ill of the lawyer.
 
 
 17
 Cahall uses a shotgun before this court, spraying us with complaints that range from the trivial to the irrelevant. First, he points to the fact that the Union called only two witnesses on his behalf. Union official Martin says that he tried to find more witnesses, but ran into remarks like "He is lucky he has not been caught before this." Martin concluded, "I had nobody to help us."
 
 
 18
 In addition, Cahall is unhappy that "Skip" Bailey was not called to testify that Cahall arrived at the truck stop at 11:30 p.m. instead of 11:08 p.m., as Big Bear claims, or 11:15, as Cahall testified. Bailey would also have testified that Cahall stopped to help him hook up a trailer, an event Big Bear supervisors did not see, thus impeaching the supervisors' contention that they followed him throughout his journey. It is hard to imagine, however, that this evidence could have been considered sufficient to overcome the evidence presented to the arbitrator by Big Bear.
 
 
 19
 Moreover, there is considerable doubt whether Cahall told the Union about Bailey, who drove for another company and resided in another state. In a deposition of March 14, 1983, Cahall stated that he told the Union attorney about Bailey. At an earlier point in the same deposition, however, he said he was not sure whether he told the attorney about any witnesses. In a deposition taken on April 14, 1983, Cahall admitted that he did not give the attorney the names of any potential witnesses. In any event, the mere failure to call Bailey simply does not rise to the level required by Hines and Poole to show a breach of the duty of fair representation.
 
 
 20
 Cahall also attacks attempts by Union officials to reach a favorable settlement. As part of this, a Union official stated that "maybe the man did take a little too much time." This statement was not made before the arbitrator and did not prejudice the arbitration proceedings. Moreover, the settlement route was a most legitimate one at that point, the evidence against Cahall being quite strong.
 
 
 21
 Cahall also argues that his own attorney should have been allowed to handle the arbitration proceeding. In Malone v. United States Postal Service, 526 F.2d 1099 (6th Cir.1975), however, it was held that a postal worker did not have a right to be "represented by someone other than the exclusive collective bargaining agent in grievance arbitration proceedings under the collective bargaining agreement." Id. at 1101. In Schleper v. Ford Motor Co., 107 L.R.R.M. 2500 (D.Minn.1980), the court came to the following conclusion:
 
 
 22
 "The contract, together with Section 9(a) of the Labor Management Relations Act, 29 U.S.C. Sec. 159(a), prohibit an employee from retaining his own counsel to represent him at grievance proceedings. * * * Plaintiff, as an aggrieved employee, was not a party to the proceeding and had to rely on the Union representative to exhaust his contractual remedies. See, Malone v. United States Postal Service, 526 F.2d 1099, 90 L.R.R.M. 3287 6th Cir.1975 . The Union, in fairly representing plaintiff, acts for the benefit of all its members. To avoid undermining the grievance process, both in terms of member confidence and cost, and to assure that similar complaints and contract provisions are consistently treated, a union must protect its role as exclusive representative of its employees. See, Vaca v. Sipes, supra."
 
 
 23
 Id. at 2502. Cahall points to no part of the collective-bargaining agreement that would give him a right to bring in his own attorney.
 
 
 24
 Cahall also points to something called the "Booth Rule" i.e., a break should only be calculated from the time the truck driver sits down in the booth at a truck stop to the time he gets up; walking into the truck stop restaurant, restroom visits, paying the bill, etc., should not be counted as part of the break period). The only support for Cahall's allegation that there is, in fact, a Booth Rule is provided by a former union steward who heard someone named Herman Maxwell discuss it some years earlier. The Union did not call this former steward as a witness, in part because he is now part of Big Bear management and possibly unreliable as a Union witness. The Union did, however, raise the Booth Rule before the arbitrator.
 
 
 25
 Cahall claims that Big Bear breached Article 20.3 of the Union contract, which states: "The Union agrees to cooperate in correcting inefficiencies of members which might otherwise necessitate discharge." We agree with Judge Duncan that "taking of breaks of excessive duration and falsifying records" cannot be equated with "inefficiency." Moreover, it is clear that the matter was put before the arbitrator by the Union and rejected.
 
 
 26
 The final argument to be considered involves a late response by the Union to the seventh request in a set of requests for admissions, one of which read: "Admit that the Union breached its duty to represent Donald E. Cahall." It is true that "(e)ach matter of which an admission is requested ... is admitted unless within 30 days after service of the request, or within such shorter or longer time as the court may allow, the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter ...." Fed.R.Civ.P. 36(a). But as Magistrate King (who considered this issue below) points out,
 
 
 27
 "Rule 36(b) of the Federal Rules of Civil Procedure provides that the Court may permit the withdrawal of an admission 'when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice him in maintaining his action or defense on the merits." '
 
 
 28
 Magistrate King's opinion and order at 2. As the magistrate correctly states, Rule 36 was "never intended to be a substitute for trial." Since allowing the admissible would virtually decide the case, the magistrate correctly allowed the withdrawal of the admission so that the case might be heard on the merits. The same result was reached in Westmoreland v. Triumph Motorcycle Corp., 71 F.R.D. 192 (D.Conn.1976), where "the admissions were so vital to the defendant's case that they almost amounted to a complete admission of liability." Id. at 193. Finding no prejudice, the district court permitted the admissions to be withdrawn.
 
 
 29
 It is clear that "Request No. 7" goes to the heart of this case. Thus, the first part of the test on allowing withdrawal ("presentation of the merits of the action will be subserved thereby") is satisfied. And while Cahall's brief and reply brief devote twenty-two pages to this subject, neither brief points to any prejudice. It is true that the answers to the admissions were submitted only two weeks before the close of discovery. But as the magistrate points out, what was there for Cahall to discover? In any event, the Union in its answer specifically denied that it had breached its duty of fair representation, thus putting Cahall on notice that it denied the charge. We believe that Magistrate King was correct in allowing withdrawal of the admissions.
 
 
 30
 The district court's grant of summary judgment is AFFIRMED.